UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

FRANKENMUTH MUTUAL INSURANCE
COMPANY,

                    Plaintiff,

          v.                                              CAUSE NO. 3:20-CV-76 DRL

FUN F/X II, INC. and CAO ENTERPRISES
II, LLC,

                    Defendants.

OPINION & ORDER

On July 26, 2019, a fire destroyed an industrial warehouse in South Bend. This case poses the

question whether Frankenmuth Mutual Insurance Company must provide insurance coverage to Fun

F/X II, Inc. (a costume and theatrical supply retailer who used the warehouse) and Cao Enterprises

II, LLC (the warehouse owner) for the fire damage. Frankenmuth insured both companies.[1]

The answer hinges on whether Fun F/X maintained an automatic sprinkler system at the

warehouse per the insurance policy and whether it provided notice to Frankenmuth of an impairment

in the system. Frankenmuth seeks a declaration of no coverage. The parties filed crossmotions for

summary judgment. The court grants summary judgment for Frankenmuth.

BACKGROUND

Frankenmuth issued a commercial policy to Fun F/X providing certain property and liability

coverage from March 22, 2019 to March 22, 2020 [ECF 1-1 at 1]. The policy included a protective

safeguards endorsement (PSE) [*id.* 53]. The PSE contained a condition and two exclusions [*id.* 53-54].

As the condition to coverage, the policy required Fun F/X "to maintain the protective devices or

---

[1] This opinion refers to the companies together as a singular Fun F/X for ease, unless context requires that
they be named individually.

services" identified in a schedule, which included an "automatic sprinkler system" and "related supervisory services" [*id.* 53]. For purposes of this case, the policy defined an automatic sprinkler system as follows:

> Any automatic fire protective or extinguishing system, including connected:
> (1) Sprinklers and discharge nozzles;
> (2) Ducts, pipes, valves and fittings;
> (3) Tanks, their component parts and supports; and
> (4) Pumps and private fire protection mains. . . . [*id.*].

The PSE also contained two exclusions. Frankenmuth was not required to pay for loss or damage caused by or resulting from fire if, before the fire, Fun F/X either "[k]new of any suspension or impairment in [the automatic sprinkler system] and failed to notify [Frankenmuth] of that fact" or "[f]ailed to maintain [the automatic sprinkler system], and over which [Fun F/X] had control, in complete working order" [*id.* 54].

Victor Cao, the sole shareholder of Fun F/X and sole member of Cao Enterprises, testified that there was a functional automatic sprinkler system when the warehouse was acquired in 1999 [ECF 45-3]. He said the building had two risers, which he described as the vertical pipes where the water came into the building. He also said the building had two post-indicator valves, where one would shut off the water to the sprinkler system. He said the building had several hundred sprinklers at the time of the fire. He believed that the system's components were the same as those reported by Brandon Bumpus, the Legacy Fire Protection inspector who examined the building in 2016 and 2017.

Mr. Bumpus, who worked in fire sprinkler inspection service, testing, and installation, inspected the building on August 24, 2016 [ECF 45-6, 45-7]. His inspection paperwork reflected a total of fourteen system components that he tested according to National Fire Protection Association standards. These components included the alarm valve (which prevents backflowing), the post-indicator valves (a valve that can shut off the water supply), and the waterflow switch. He said there

were two risers in the basement. He testified that he flowed the water for thirty seconds during his test, and that all components tested "okay."

The inspector testified that he would characterize the fourteen components he tested as the fire sprinkler system. He called the sprinkler system's first component the post-indicator valve. His inspection didn't include anything upstream of the post-indicator valve because, based on his testimony, that wasn't part of the system. He testified that his company only inspected or serviced the private fire protection waterlines that run into buildings when they are asked by the customer, but they cannot inspect anything underground. He said they "can just ensure that the valves are working properly and that water is flowing through the valves and that they close all the way." The waterline from the valve to the city's water main wasn't inspected. Although he testified that he didn't know which lines underground would be public or private, he said in his experience the city owns the waterline up to the property line where the control valve is located, and the property owner has responsibility for the system from the property line into the building.

Marlene Butts is a general adjuster at Frankenmuth [ECF 45-4]. When asked about the list of components from the August 2016 inspection report, she testified that she had no reason to believe that the devices were not in place inside the building at the time of the fire. She said, to the best of her knowledge, the same components of the sprinkler system that were in place in 2016 were also in place at the time of the fire.

The warehouse was located at 1000 West Sample Street. Mr. Cao created a diagram of the property that shows a north-south water supply line located west of the property line for 1000 West Sample [ECF 45-3; ECF 45-12]. He testified that he didn't think it made a difference whether that supply line was a private supply line or a public main; whether it was main or private, it was out of his control because it wasn't on his property. He admitted the north post-indicator valve also wasn't on the property located at 1000 West Sample. He had no idea why that valve wasn't there.

The inspector returned to the property on September 28, 2017 [ECF 45-6]. Mr. Cao was present. The inspector couldn't perform his testing because there was no water supply to the system. As he put it, the "water was shut off." The inspector testified that the system wouldn't work without water pressure. He told Mr. Cao that there was no water pressure to the system [*id.* 30; *see also* ECF 45-3 at 50 ("He told me that there wasn't water pressure in the system.")].

While at the property on September 28, 2017, the inspector called South Bend Water Works. Mr. Cao was standing next to him during the phone call. The inspector explained to the city that there was no water pressure in the sprinkler system at 1000 West Sample, but he never received an explanation as to why. The inspector told Mr. Cao that Mr. Cao needed to follow up with the city because the city said it didn't shut the water off.

The inspector went back to the building the next day. He planned to see if the shutoff valve from the city to the building had been closed. He wasn't able to find the shutoff valve or find out how the water service to the sprinkler system was cut off. Still today he doesn't know.

After the inspector told Mr. Cao that there was no water in the system and that he couldn't get an answer from South Bend Water Works, Mr. Cao called South Bend Water Works to let the agency know that the water had been shut off the water and that the agency needed to get the situation resolved. Mr. Cao also contacted the fire inspector to see if he knew what happened.

Robert Krizmanich, a fire inspector for the City of South Bend, thereafter called Mr. Cao in November 2017 to conduct a fire inspection at 1000 West Sample [ECF 47-7]. Mr. Cao says he called the fire inspector back on November 15, 2017 (48 days after the 2017 inspection by Mr. Bumpus) and recorded the telephone conversations from three short calls that day using his phone [ECF 45-3, 47-8]. Mr. Cao first called the fire inspector and told him that the city turned off his sprinkler water. The fire inspector said the city might have turned the water off for the neighbor to the west. The fire inspector called Mr. Cao back a few minutes later and said he could drive over to the property to

check it out so that way he would have more information when he talked to the people from South Bend Water Works. The fire inspector then called Mr. Cao again a little over an hour later. He told Mr. Cao that he talked to the property owner next door, and the neighbor's best recollection was that the city turned off the water in March or April of that year. Mr. Cao thanked the fire inspector for the information and said he would get with the water company to see what he could find out.

Mr. Cao called South Bend Water Works sometime that same day and talked to an unidentified representative. He says he was told again that the agency didn't have any information about the shutoff, but the agency would look into it and get it resolved. Mr. Cao acknowledged that not having water pressure to the sprinkler system would cause a problem in the event of a fire.

Scott Horvath, the manager of meter service for South Bend Water Works, testified that water mains are owned by the city and private lines are owned by the customers [ECF 47-3].[2] He said the city in 2017 performed a cut and cap on all of the lines to 1008 West Sample next door to the warehouse at 1000 West Sample. He testified that the city didn't have a water main that ran between the warehouse at 1000 West Sample and the adjacent property; he called it a private line. He didn't deny that the city may have done a cut and cap on what he was calling a private line.

Darric Cole, a job leader at South Bend Water Works, confirmed that the water department cut and capped two six-inch private water mains running north off the city's public water main on April 26, 2017 at 1008 West Sample [ECF 47-4]. He said, at the time, it was believed that all of the structures at 1008 West Sample as well as the building at 1000 West Sample were scheduled for or in the process of demolition. The six-inch pipe (north-south pipe) running north from the city's water main was the only fire or sprinkler system supply for Fun F/X's property.

---

[2] Mr. Horvath testified that the City of South Bend Municipal Utilities Rules and Regulations apply to his work as a manager of meter services. The March 2017 edition defines a main as a water pipe used for distribution of water [ECF 47-10]. A public main is "owned by the Utility and usually on a public right of way" [*id.*]. A private main is "owned by others and usually on undedicated streets to serve private developments" [*id.*].

On July 2, 2019, Mr. Cao completed authorizations for the city to restore domestic water service to 1000 West Sample [ECF 45-3, 47-11]. A domestic line supplies household and drinking water, whereas a fire line supplies water primarily for fire protection [ECF 47-10]. There was a two-inch line that supplied the domestic service to the building separate from the six-inch line that supplied the sprinkler system [ECF 45-3]. The domestic water service was restored after Mr. Cao submitted his applications. He didn't talk to the technician about the service to the sprinkler system because he says he didn't know that was still an issue.

Mr. Cao never notified Frankenmuth that the water supply was shut off during the 48-day period from when he learned of the issue from the private inspector to when he interacted with the fire inspector. He said he didn't call Frankenmuth because, at the time, he had contacted people that he thought could do something about it. There isn't any evidence in the record to show that Mr. Cao (or anyone else on behalf of Fun F/X) notified Frankenmuth that the system lacked water at any point before the fire. The fire occurred on July 26, 2019. At the time, no water was discharged from the sprinkler system. The cause of the fire remains undetermined.

Fun F/X didn't receive the first bill for the restored domestic water service until after the July 2019 fire. The bills for the service periods from July 3, 2019 to July 17, 2019 and from July 17, 2019 to August 7, 2019 each included a line-item charge for "Fire Protection Priv" [ECF 47-12], though the water supply to the fire line was never restored [ECF 45-3].

On January 24, 2020, Frankenmuth filed a complaint seeking a declaratory judgment that it has no obligation to provide insurance coverage to Fun F/X relating to losses from the fire. In response to the complaint, Fun F/X asserted a counterclaim for breach of the insurance policy. Frankenmuth maintained its position that it owed no coverage because Fun F/X had not met the PSE's coverage condition and because both exclusions applied. Both sides filed summary judgment motions on issues relating to the PSE coverage condition and exclusions. With these dispositive

motions, Frankenmuth filed a motion to strike several paragraphs from Fun F/X's statement of material facts, and Fun F/X filed a motion to exclude the South Bend utility regulations, evidence relating to a frozen pipe in the sprinkler system during the winter of 2014-2015, and a statement regarding when Mr. Cao took action to restore water service to the system in 2017.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020). In a case involving crossmotions for summary judgment, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

The court (sitting in diversity) applies Indiana's choice of law rules. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *Ruiz v. Blentech Corp.,* 89 F.3d 320, 323 (7th Cir. 1996). Though the insurance policy doesn't appear to have a choice of law provision, neither side has raised the choice of law issue, so the court applies Indiana substantive law. *See McCoy v. Iberdrola Renewables, Inc.,* 760 F.3d 674, 684 (7th Cir. 2014).

Under Indiana law, interpretation of an insurance policy is a question of law to be decided by the court. *See Nat'l Fire and Cas Co. v. West By and Through Norris,* 107 F.3d 531, 534-35 (7th Cir. 1997) (citations omitted). The insured has the burden of establishing coverage, and the insurer bears the burden of demonstrating that any exclusion applies. *Id.* at 535.

Insurance policies are subject to the same rules of judicial construction as other contracts. *State Farm Mut. Auto. Ins. Co. v. Jakubowicz,* 56 N.E.3d 617, 619 (Ind. 2016). "When confronted with a dispute over the meaning of insurance policy terms, Indiana courts afford clear and unambiguous policy language its plain, ordinary meaning. By contrast, courts may construe—or ascribe meaning to—ambiguous policy terms only." *Erie Indem. Co. v. Est. of Harris,* 99 N.E.3d 625, 630 (Ind. 2018) (citations omitted). An ambiguity doesn't exist in the policy merely because the parties offer different interpretations of its language. *See id.*; *Berkshire Hathaway Homestate Ins. Co. v. Basham,* 113 N.E.3d 630, 634 (Ind. Ct. App. 2018). An ambiguity exists only when the policy's provision proves "susceptible to more than one reasonable interpretation." *Erie Indem.,* 99 N.E.3d at 630 (emphasis omitted).

The court interprets "policy terms from the perspective of the ordinary policyholder of average intelligence." *Ind. Farmers Mut. Ins. Co. v. Weaver,* 120 N.E.3d 280, 284 (Ind. Ct. App. 2019); *see also Erie Indem.,* 99 N.E.3d at 630. Only when intelligent policyholders could honestly disagree about the policy's meaning will the court find its terms ambiguous and subject to judicial construction, else the court applies the plain and ordinary meaning of the policy's terms. *See Erie Indem.,* 99 N.E.3d at

630. The court's job is "to ascertain and enforce the parties' intent as manifested in the insurance contract." *Basham*, 113 N.E.3d at 634 (citation omitted).

When an insurance policy imposes a duty on the insured, Indiana law requires that the insured substantially comply with this duty. *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 365 (7th Cir. 2017). "Any doubts as to coverage shall be construed against the insurer as the contract drafter." *Zeller v. AAA Ins. Co.*, 40 N.E.3d 958, 962 (Ind. Ct. App. 2015) (citation omitted).

A.    *The Coverage Condition within the Protective Safeguards Endorsement.*

Fun F/X argues that it substantially complied with the PSE to trigger coverage for this fire loss. The company says the underground water supply pipe leading to the post-indicator valves of the company's automatic sprinkler system—what the parties and this opinion call the north-south pipe— wasn't part of the system as defined by the policy, so the company had no obligation to maintain it. Frankenmuth counters that the system includes any connected private fire protection main, including this north-south pipe, which Fun F/X failed to maintain. The court must decide whether the company "maintained" an automatic sprinkler system and whether that included the north-south pipe as a "private fire protection main."

Fun F/X offers its interpretation as to what components made up its automatic sprinkler system. The company says the system's components were (1) two post-indicator valves located outside and along the building's west side; (2) two "wet pipe" or riser assemblies located in the basement (including a vertical supply pipe, a main drain, a control valve, a pressure gauge, an alarm valve, and a waterflow switch); (3) underground piping from the post-indicator valves to the riser assemblies; and (4) several hundred sprinklers (or sprinkler heads) located in the ceiling of each floor.

The system received its water supply from an underground pipe running in a north-south direction. Fun F/X omits the north-south supply pipe in its list of components. Fun F/X says it never owned, controlled, or operated the north-south pipe, so the company had no obligation to maintain

it. Fun F/X's view of what constitutes the components of the sprinkler system is based on what the inspector examined in August 2016. Back then, he didn't inspect the north-south pipe that supplied water to the system. Fun F/X's owner says his understanding of the sprinkler system mirrors the scope of this prior inspection, thereby omitting the north-south supply pipe.

In deciding whether the north-south pipe is part of the system, the court turns to the policy's plain language. *See Nat'l Fire*, 107 F.3d at 535. The policy defines an automatic sprinkler system as "[a]ny automatic fire protective or extinguishing system, including connected . . . private fire protection mains" [ECF 1-1 at 53]. A "main" serves as a primary conduit for water, in this instance for fire protection. *See Main*, Oxford English Dictionary (2022) (defining "main" as a "principal channel, duct, or conductor for conveying water . . ."). It proves "private" by serving private uses or developments without the city owning it. *See Private*, Oxford English Dictionary (2022) (defining "private" to mean "[r]estricted to one person or a few persons as opposed to the wider community; largely in opposition to *public*").

Both the meter service manager and a job leader at South Bend Water Works confirmed that the north-south pipe was a private fire protection main—a conclusion already borne out by the plain meaning of these words.[3] This north-south pipe supplied water to Fun F/X's sprinkler system at its warehouse—a private development. Nothing on this record reflects the city's ownership or public use. Though true that the city cut and capped the north-south pipe, from all indications this was done (even if erroneously) believing all the structures at the neighboring property and the Fun F/X warehouse were scheduled for or in the process of demolition. Fun F/X's utility bills from July to

---

[3] Frankenmuth submitted a signed letter from the job leader (Darric Cole) [ECF 47-4], but not an affidavit or deposition testimony. "[I]t's an open question in this circuit whether anything more than an unsworn statement is needed to oppose summary judgment." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). Rule 56 allows "parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Id.* No one has opposed the court's consideration of this letter.

August 2019 included charges for private fire protection; and, though it turned out that the water supply was never restored, these bills tend to confirm there was a private fire protection main connected to the building. In short, the north-south pipe was a private fire protection main and part of the sprinkler system.

Fun F/X has not placed this fact genuinely in dispute. The company's owner simply testified, "[I]f it's private, it wasn't my private. Somebody else's private. So whether it's main or private, it was out of my control" [ECF 45-3 at 111]. His focus remained on whether the north-south supply pipe was within the company's control, not whether it was a private main and thus part of the policy-defined automatic sprinkler system. This part of the policy doesn't require control; it requires the water main to be private. In addition, his subjective belief as communicated in somewhat waffling terms— "if it's private, it wasn't my private"—offers nothing to alter the plain meaning of a private fire protection main. *See Westfield Ins. Co. v. Hill*, 790 F. Supp.2d 855, 864 (N.D. Ind. 2011) ("subjective beliefs of the [insured] are not relevant to the applicable standard for determining whether an insurance policy provision is ambiguous"). Nothing demonstrates that this north-south pipe was owned by the city or served public uses. Instead, the owner's understanding of the system stems from the scope of the 2016 inspection, but nothing demonstrates that the inspector used the policy's understanding of a sprinkler system as a guide in determining what to inspect. In this insurance coverage dispute, the policy's plain meaning governs, not what the inspector examined in 2016. *See Nat'l Fire*, 107 F.3d at 535 ("unambiguous provision in an insurance policy must be enforced").

Fun F/X also relies on city maps with handwritten annotations [ECF 45-14, 45-15]. Though these maps were maintained by the city, there isn't any evidence about who made these annotations, why they were made, or what they are intended to mean. The company says the north-south pipe isn't labeled "private," whereas the east-west pipe located south of the property (underneath Kerr Street) is labeled "private." Based on this scant record, it would be pure speculation to conclude from these

annotations—particularly without any provenance to them—that they mean that one segment of the pipe was private when another part of the pipe wasn't, much less that the city owned the north-south segment for public use. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (court isn't "required to draw every conceivable inference from the record" and "mere speculation or conjecture will not defeat a summary judgment motion") (citations and internal quotations omitted). On this record, the north-south pipe was indisputably a private fire protection main within the policy's meaning.

The court now turns to whether Fun F/X maintained an automatic sprinkler system. The policy leaves the word "maintain" undefined. The word nonetheless means "to keep . . . in repair; . . . to keep vigorous, effective, or unimpaired; to guard from loss or deterioration"—all materially equivalent definitions. *See Maintain*, Oxford English Dictionary (2022). The word "maintain" also may mean "to take action to preserve . . . in working order," *see id.*, but this particular policy winnows this definition because a separate policy exclusion addresses whether this sprinkler system was in complete working order. Reading the requirement that the sprinkler system was in complete working order into this coverage provision thus would render the policy exclusion meaningless—contrary to the court's job to give effect to each of the policy's provisions. *See Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 994 (Ind. Ct. App. 2014) (court construes policy "so as not to render any words, phrases, or terms ineffective or meaningless"). The court's job is "to ascertain and enforce the parties' intent as manifested in the insurance contract," *Basham*, 113 N.E.3d at 634, and the court is left with just a singular understanding of the word "maintain," *see Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind. Ct. App. 1997) (permitting consultation of dictionary definitions).

Based on the undisputed facts, Fun F/X failed to maintain an automatic sprinkler system for two reasons. First, the system included the north-south water supply pipe, but the facts show the pipe had zero operational effectiveness from April 2017 through the date of the fire in July 2019. The system wasn't kept unimpaired; instead, it was cut and capped. It was not generally in good repair, or

in good repair to facilitate the system's operation. Yes, the pipe continued to exist, but having been cut and capped, it was worthless for the purpose of providing water to the sprinkler system. And without water, the sprinkler system was worthless for the purpose of mitigating fire damage. By definition, maintenance means more than mere possession of a system that has no ability to function in a way that is designed to serve the system's purpose. *See Maintain*, Oxford English Dictionary (2022). In saying as much, the court observes that this plain meaning of "maintain" dovetails with the policy's notice provision that required notice to the insurer of any suspension or impairment in the system, reinforcing this clear understanding of the parties. *See Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 994 (Ind. Ct. App. 2014) (court "must accept an interpretation of the contract language that harmonizes the provisions").

Second, even excluding the north-south pipe as one of the system's components, the record still shows that Fun F/X had not maintained an automatic sprinkler system within the PSE's meaning. This is true because the system's other parts—the post-indicator valves, the water flow switches, the alarm valves, and the sprinkler heads—cannot function as a sprinkler system without water. In 2017, the inspector could not test these parts because there was no water supply. Fun F/X knew about the lack of water supply. An automatic sprinkler system without water does nothing to mitigate fire damage. Fun F/X saying that it maintained a sprinkler system without any water supply would be just like a person saying she has maintained a fire alarm system without electricity, a ventilator without oxygen, a heating system without gas, a movie theater without movies, or a swimming pool without water. None can be the thing it purports to be or perform its intended function without the proverbial grease in the wheels. Without water, this wasn't a sprinkler system, much less an "automatic" one. *See Automatic*, Oxford English Dictionary (2022) ("Of action, etc.: self-generated, spontaneous; (of a thing) self-acting; having the power of motion within itself."). Any person of average intelligence would understand that. *See Ind. Farmers*, 120 N.E.3d at 284.

Fun F/X offers no materially different definition of "maintain." Indeed, the company relies on *Berkshire Hathaway Homestate Ins. Co. v. Chi. Metro. Hosp., LLC*, 2021 U.S. Dist. LEXIS 16800 (N.D. Ill. Jan. 29, 2021). Also an insurance coverage dispute, it concerned fire damage at a vacant hospital. *Id.* at 1. Berkshire issued a commercial insurance policy to the hospital with a protective safeguards endorsement, quite similar to the one here. *Id.* at 4-5. The PSE required the hospital to maintain an automatic fire alarm. *Id.* at 5. The policy had the same two exclusions as the PSE today. *Id.*

The parties disputed whether the hospital satisfied its obligation to "maintain" a fire alarm system under the insurance policy. *Id.* at 16. The insurer defined "maintain" to mean to ensure functionality. *Id.* at 19. The hospital argued that "maintain" simply meant to keep in possession of a fire alarm system. *Id.* at 20. After reviewing the policy as a whole, the court rejected each of their proposed definitions for reasons that also apply today. *Id.* at 21. Though the court applied Illinois law, the rules for policy interpretation in Illinois and Indiana largely mirror each other. *See id.* at 18-19.

The district court held that "maintain" in the coverage condition couldn't mean to ensure functionality because the PSE also contained an exclusion requiring the hospital to "maintain any protective safeguard listed in the schedule, and over which it had control, in complete working order." *Id.* at 19-20 (brackets and italics omitted). If "maintain" were to mean "ensure functionality," then the exclusion's phrase "maintain . . . in complete working order" would be superfluous. *Id.* at 20 (citing *Breton, LLC v. Graphic Arts Mut. Ins. Co.*, 446 Fed. Appx. 598 (4th Cir. 2011)).

*Berkshire Hathaway* also held that "maintain" couldn't mean simply to keep possession of the system because this interpretation didn't fit the whole policy. *Id.* "The word 'maintain' must be read in light of the 'risk undertaken, the subject matter that is insured and the purposes of the entire contract.'" *Id.* (quoting *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992)). When reading the word in this light, to "maintain" a fire alarm "must entail some baseline expectation of functionality that would make the fire alarm helpful in preventing or controlling fires." *Id.* at 21.

Unsatisfied with each of the party's proposed definitions, *Berkshire Hathaway* turned to Black's Law Dictionary. *Id.* This resource defined "maintain" as follows: "To care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." *Id.* (quoting Black's Law Dict. 1039 (9th ed. 2009)). Armed with this definition, the court decided that the hospital "not only possessed an alarm system but cared for it for purposes of operational productivity." *Id.* at 22.

Crucial to the court's holding was that the hospital had retained an inspector to perform weekly visual examinations of the fire alarm system. *Id.* Though he hadn't received any special training in the building's type of alarm system and could not have repaired the system, his inspections led him to believe that the system didn't need repairs. *Id.* Each week, he "would visually inspect whether electricity was flowing to the alarm system by checking whether all the lights on its components were lit." *Id.* at 4. For this reason, the court found that the hospital "maintained" a fire alarm system by not only possessing the system but engaging in general repair and upkeep. *Id.* at 22.

After discussing *Berkshire Hathaway*, Fun F/X argues that it too "possessed a sprinkler system within the meaning of the PSE that they cared for, engaged in general repair and upkeep and, most importantly, kept the components of it operational and in complete working order at the time of the fire" [ECF 45 at 9]. Fun F/X advances its narrower view of the system's components (excluding the north-south water supply pipe) and cites facts to show that the post-indicator valves, the water flow switches, the alarm valves, and all sprinklers functioned at the time of the fire. But once more, this misses the point on the north-south pipe; and, quite contrary to *Berkshire Hathaway*, Fun F/X's inspection showed that the system wasn't being maintained. This fact proves a key difference to *Berkshire Hathaway*: whereas there the property owner conducted weekly inspections to ensure the supply of electricity to the fire alarm system, the owner here permitted the lack of water supply to linger from September 2017 until the July 2019 fire—almost two years—without correction, despite any investigation into the lack of water supply.

15

Accordingly, Fun F/X has not demonstrated its right to summary judgment as a matter of law. The court denies the company's summary judgment motion as to the coverage condition. Although Frankenmuth didn't move for summary judgment on this issue, the court could nonetheless entertain granting summary judgment in its favor on the coverage condition issue. Frankenmuth has not conceded the issue but actively opposed summary judgment. But before doing so, the court would be required to afford Fun F/X notice of that possibility and a reasonable opportunity to respond. *See* Fed. R. Civ. P. 56(f)(1); *see also Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 603 (7th Cir. 2015). Though it seems Fun F/X has already had a full and fair opportunity to ventilate the issue of insurance coverage through briefing on its own motion, *see In re Harris Pine Mills*, 44 F.3d 1431, 1439-40 (9th Cir. 1995), the court acknowledges that "granting summary judgment *sua sponte* is a 'hazardous' procedure [that] 'warrants special caution' and is often unnecessary," *Jones v. Union Pacific R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002). Here, it is indeed unnecessary because Frankenmuth prevails on a policy exclusion, so the court merely denies Fun F/X's summary judgment motion.

      B.     *PSE Exclusion: Failure to Provide the Insurer Notice of an Impairment.*

Frankenmuth requests summary judgment based on a policy exclusion: when Fun F/X "[k]new of any suspension or impairment in any protective safeguard [including the automatic sprinkler system] and failed to notify [Frankenmuth] of that fact" [ECF 1-1 at 54]. Fun F/X advances no exception from the policy's terms.[4] Instead, Fun F/X argues that this exclusion doesn't apply because it didn't have actual knowledge of any suspension or impairment in the sprinkler system.

---

[4] As Frankenmuth points out, the only potential exception to this exclusion is if part of the system is shut off "due to breakage, leakage, freezing conditions or opening of sprinkler heads." In these scenarios, notification to Frankenmuth isn't necessary if the insured can restore full protection within 48 hours. Frankenmuth says this exception doesn't apply. Fun F/X doesn't respond to this point, resulting in waiver. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017).

To get there, Fun F/X contends that the exclusion only applies to a suspension or impairment *in* the system and not *to* the system, so the exclusion cannot be triggered when the north-south pipe wasn't part of the system. The court finds this argument unavailing because it hinges on the already-rejected assumption that the north-south pipe wasn't part of the system and because it hyperfocuses on a perceived difference between "in" and "to" not borne out by their plain meaning or the policy's intent. *See Basham*, 113 N.E.3d at 634. There was an impairment in the system—the cut and capped north-south pipe.

In addition, Fun F/X (through its owner) knew the system lacked water supply in September 2017.[5] He admitted this was a problem. Because the system couldn't work without water, this problem also constituted an impairment in the system within the PSE's meaning. *See Impairment*, Oxford English Dictionary (2022) ("fact of being impaired; deterioration; injurious lessening or weakening"). Fun F/X admitted that it failed to notify Frankenmuth of this impairment during the 48-day period after the inspector told the company about it. There isn't any evidence in the record to show that Fun F/X ever notified Frankenmuth of the impairment before the fire.

Fun F/X argues that the company passed over such notification because the company had contacted South Bend Water Works and received assurances that the water service would be restored. Whatever substantial compliance or grace might exist in the near term, the record shows that Fun F/X learned again in November 2017 that the system lacked water supply. From then until the fire in July 2019, the company took no steps to confirm that the water supply had been restored to change the state of its knowledge. The company assumed, perhaps guessed, but that is the very purpose of this notification provision—to alert the insurer that an impairment exists so that the insurer and insured can remedy the issue rather than guess at it before a fire. *See, e.g., Schwartz & Schwartz of Va.,*

---

[5] The insurance policy containing the same PSE was in effect when Fun F/X learned of this impairment in September 2017, and the policy was continually renewed thereafter.

*LLC v. Certain Underwriters at Lloyd's*, 677 F. Supp.2d 890, 903-04 (W.D. Va. 2009). Fun F/X deprived the insurer of this opportunity—indeed its contractual right—to its detriment. Frankenmuth could have implemented emergency measures to verify water supply restoration, increased premiums, cancelled the policy, or at least not renewed the policy in 2018 and 2019.

Fun F/X points to bills that it received from South Bend Water Works reflecting charges for public and private fire protection. The company says these bills confirmed its reasonable belief that the city had restored water service. They do no such thing. From this record, there appears to be no history of billing for water service to this property from November 2017 until July 3, 2019—seemingly further confirmation that water service had not been restored. Moreover, the only bills the company then received (for service periods from July 3, 2019 to July 17, 2019 and from July 17, 2019 to August 7, 2019), and the only bills Fun F/X uses now to support its argument, came to the company *after* the fire. In short, the bills cannot be used to say the company reasonably understood before the fire that water service had been restored, or that its obligation to notify the insurance company somehow had been forestalled. No matter the result on the coverage provision, the court would need to grant summary judgment for Frankenmuth on this policy exclusion because Fun F/X knew of an impairment in the system and failed to notify the insurance company of that fact.[6]

C.      *Frankenmuth's Motion to Strike.*

Frankenmuth asks the court to strike several paragraphs from Fun F/X's statement of material facts, the "private" annotations to the city map drawing [Ex. 12 at ECF 45-14], and the entirety of Fun F/X's exhibits 10, 11, 13, and 15 [ECF 45-12; 45-13; 45-15; 45-17]. "Motions to strike are heavily disfavored, and usually only granted in circumstances [when] the contested evidence causes prejudice

---

[6] Both sides requested summary judgment on another exclusion. The parties dispute whether Fun F/X had control over the north-south pipe for that exclusion to apply. The court needn't decide the meaning of "control" under the policy and whether Fun F/X maintained the components over which it had control in complete working order because the notice exclusion applies.

to the moving party." *Rodgers v. Gary Cmty. Sch. Corp.,* 167 F. Supp.3d 940, 948 (N.D. Ind. 2016); *see also Olson*, 750 F.3d at 714; *Kuntzman v. Wal-Mart*, 673 F. Supp.2d 690, 695 (N.D. Ind. 2009). In truth, Frankenmuth's arguments focus on the admissibility of these materials; Frankenmuth hasn't argued why any of the contested evidence would cause them prejudice. "Motions to strike words, sentences, or sections out of briefs serve no purpose except to aggravate the opponent—and though that may have been the goal here, this goal is not one the judicial system will help any litigant achieve. Motions to strike disserve the interest of judicial economy." *Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007). Frankenmuth prevails notwithstanding these exhibits. The court denies the motion to strike.

D.      *Fun F/X's Motion to Exclude.*

Fun F/X seeks to exclude from the summary judgment record the 2017 city regulations. The company argues that these utility regulations should be disregarded because they lack authentication, constitute inadmissible hearsay, and remain irrelevant and improper extrinsic evidence to interpret the insurance policy, having not been incorporated by the PSE. The court addresses each argument now.

First, Fun F/X challenges the authenticity of these regulations. Frankenmuth says the regulations bear South Bend's seal and signature from its common council and mayor, so they are self-authenticating. *See* Fed. R. Evid. 902(5). The city's meter service manager testified that the city makes these regulations available online and that he was familiar with them to the extent he deals with them in his day-to-day work. For these reasons, the court is satisfied that the regulations are authenticated. Fun F/X never responded to these points. *See Ennin,* 878 F.3d at 595 ("Failure to respond to an argument generally results in waiver[.]").

Second, Fun F/X calls the regulations hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Frankenmuth isn't offering the regulations to prove the truth of anything asserted in them. It offers the regulations as guidance for the court to determine whether the north-south pipe qualifies as a private fire protection main. The

regulations aren't being offered as assertions of facts. Laws aren't hearsay. They must be authenticated as applicable at the time, but they aren't excludable as hearsay today. Fun F/X also never responds to this argument, so once more waived its position. *See Ennin,* 878 F.3d at 595.

Third, Fun F/X calls the regulations irrelevant and improper extrinsic evidence. Frankenmuth says the regulations are highly probative of whether the north-south pipe is a connected private fire protection main. In reply, Fun F/X contends that, because the regulations aren't being used to interpret the insurance policy, they are irrelevant. Not so. Frankenmuth offers the regulations to cast light on whether the north-south pipe is a private fire protection main, not as extrinsic evidence to prove the meaning of the term "private fire protection main" in the policy. The plain meaning of these words guides their application today, not the regulations.

Unsuccessful there, Fun F/X turns to exclude paragraphs 7 and 8 of Frankenmuth's statement of undisputed facts. These paragraphs relate to a frozen pipe in the system from the winter of 2014-2015. Frankenmuth relied on them in arguing the second exclusion. These paragraphs have no bearing on the court's summary judgment ruling, so the court denies this request as moot.

Fun F/X last argues that paragraph 21 of Frankenmuth's statement of undisputed facts should be excluded because Frankenmuth failed to cite any material to support the point. In response, Frankenmuth explains that it omitted the citation by oversight. It then provided the deposition citation. Fun F/X foregoes a reply. *See Ennin,* 878 F.3d at 595. Because the fact is indeed supported by the record, the court declines the request to exclude it. In sum, the court denies Fun F/X's motion to exclude in its entirety.

CONCLUSION

Accordingly, the court DENIES Fun F/X's summary judgment motion [ECF 44], GRANTS summary judgment in Frankenmuth's favor [ECF 46], DENIES Frankenmuth's motion to strike [ECF 49], and DENIES Fun F/X's motion to exclude [ECF 50]. Frankenmuth requested oral

20

argument in its summary judgment motion, but the court denies this request as unnecessary. The court DIRECTS entry of judgment for Frankenmuth.[7]

SO ORDERED.

April 29, 2022

*s/ Damon R. Leichty*
Judge, United States District Court

---

[7] Frankenmuth tucks in a request for attorney fees and costs but without explaining the basis for recovering them. To the extent recovery would be appropriate, Frankenmuth may proceed by way of rule after the judgment's entry. *See* Fed. R. Civ. P. 54(d).